I represent Annette Diaz, the appellant and the debtor in the underlying Chapter 13 Bank Proxy. Section 1325B defines disposable income to include current monthly income, lest the amounts reasonably necessary to be expended for the maintenance and support of the debtor. The question presented to this court is straightforward. If a debtor, if Ms. Diaz, needs to use the living expenses, is it considered disposable income under 1325B? Ms. Diaz filed Chapter 13 to save her home. She's a single woman. She's a mother of two children, 12 and 17. They live in a household of three. Her income is comprised of wages. She works as a medical assistant and earns $1,866 a month from that, and she also receives $523 in child support. She used to also rely on the annual tax refund of about $3,200 to help supplement her income. I'm going to ask you a question, not about the law, but just about the practical issue here. So I guess her tax refund is typically a little over $3,000. So just to simplify it, let's say her tax refund is $3,000, just to make the numbers easy. Under the Western District of Texas policy you're challenging, as I understand it, she would get to keep $2,000 of the $3,000, and then the other $1,000 goes to the trustee. That's correct. The way you wanted to do it is you would spread that $3,000 prorated over 12 months as part of these income calculations. If it was done your way, how much of the $3,000 would she keep and how much would she go to the trustee? In her case, she would keep the entire $3,000 because we have prorated that entire amount on Schedule I. And so why would she keep the whole amount? She has to pay some of her income to creditors, right? Yes. She is devoting her entire income to the creditors. Her income, again, consists of her wages and her child support, and that equals a little over $2,300. But what we've done on the Schedule of Income, we've added to that $272. So that increases her income up to a little over $2,600 a month. From that, you subtract the monthly living expenses, which were a little over $1,000, and that gave us the plan payment of $1,600. So she's paying out $1,600 a month? Yes, so she is. That plan payment of $1,600, I think it's $1,605 that she's paying, already includes that $272 of the prorated tax refund. So then if she's paying all of the refund out, isn't she better under the policy that lets her keep $2,000 of it? I'm not understanding the math. Well, it's already the expenses. We've reported as income, and then on the expenses, she's listed a certain amount of expenses. So she's not allowed to keep, this allows her to keep the entire $3,000 when she gets it, because she can show that she needs it on Schedule J. Schedule J is her list of expenses. All right, so I guess I'm still not trying to understand. But she's actually, $1,600 a month she's paying to the trustee, roughly? Well, she's paying that, yes, she's paying $1,600 a month, and built into that monthly payment includes the entire $3,000. And she's okay with that, because that is income that she has to factor into the calculation. But what this local rule requires is not only she has to pay that $1,600 a month, but then she has to turn around each year and pay $1,200 extra into the plan once she gets that tax refund. No, I didn't think it was being counted twice. I thought it was one or the other. It's either prorated monthly or the local rule applies. I thought that was the dispute here. No, Your Honor, it is counted twice. Every dollar that exceeds $2,000 is going to be a double payment. She's already paying in the $1,600, which includes the full $3,000. And then every year she also has to turn over the extra amount of $1,200 or $1,000. So it amounts to a double payment. And 1325B states that debtor is required to disclose all of their income, and it's reported on Schedule I. If it's this double payment, which was not really my understanding, isn't that just an obvious problem? I mean, why don't you make the argument that it's incorrect as a double payment? Instead, you're getting into all these bigger questions about, you know, does it have to be one size fits all or an individual? I mean, you can't count the same income twice. I mean, that doesn't seem hard to see a problem with. Well, and that's the crux of this appeal, Judge, that it does. It counts it twice. And the way we used to do it is we would put it all on Schedule I like we do it now. We've done it that way for nine years. Other courts have endorsed that. And the instructions require us to prorate the income that the debtor expects to receive throughout the years. The instructions to completing the official form states that if she receives money annually, we're supposed to prorate it on Schedule I. And then 1325B and the Supreme Court's interpretation in Hamilton v. Lanning of 1325B require an analysis from a below-median debtor like Ms. Diaz to take the monthly income, including all of the projected income, and subtract that from the reasonable necessary living expenses. And we did that, and we arrived at $1,600. So she's already devoting her entire refund to the plan. But this new standing order says notwithstanding the fact that it's already below, and the trustee's position is that the debtor should not be allowed to put the tax refund on Schedule I and not treat it there at all, not list it there at all. Okay, that's what I'm saying. It's really a dispute between should it be prorated monthly or should it be done with this the way the Western District policy is. I mean, the trustee's not arguing for this double counting. Well, effectively, they're saying you shouldn't have put it on the schedule at all, it would all be dealt with through the policy. You keep $2,000, everything else goes to the trustee. That's how it would be treated. Well, if we did not list it on Schedule I, the way the bankruptcy court said, and which, again, is contrary to what the Supreme Court said, if we don't list it on Schedule I, her plan payment would have been $272 less, and the plan would not have been feasible. The plan would not have been comparable because there's not enough income to pay the monthly reasonable necessary living expenses. So the way we're doing it devotes all the income to the plan, and it prevents double accounting, but not when we have to also turn over that extra money. What the bankruptcy court failed to do is to address whether or not the income, the tax refund, this income is needed to pay for the reasonable and necessary living expenses of the debtor. Again, the Supreme Court has determined that you list all your income on Schedule I, and you subtract your monthly living expenses. The difference is your disposable income, and that is what's required to be paid into the plan, nothing more. And the debtor understands that she is fine paying into the entire or contributing the entire $3,000 to the plan, but the way the standing order reads is any debtor that receives an amount over $2,000 is going to effectively pay in over a double payment. So the unsecured creditors, instead of getting a 12% dividend, which is what the plan says, they're actually going to get more because the debtor is going to have to turn over that $1,200 every year. In fact, the debtor already has turned over $1,200 of that every year, even though she's already built in the full $3,000 into the plan. But if it's not going to be double counted, if the choice is do you have to put it on the schedule like you did, tried to do, or does she get to keep $2,000, isn't she better off with it? It's all basically going to pay for the plan. Well, the way the Western District does it is you get to keep the $2,000, but you don't list it on Schedule I. So it wouldn't be devoted to the plan, but the plan wouldn't be feasible. It had to pay if we reduce the plan payment by $272. So she needs to commit some of that tax refund to the plan to make it feasible so it'll pay secured creditors. But the bankruptcy court, once it's done... Now, let's assume that she had a $9,000 or a $10,000 tax refund, which is very common. Then she would end up being in a 100% plan, effectively, would start out 12%, but she'd have to turn over $7,000 every month, even though her plan payment would be high. Now, if you look at her budget, it's a very tight budget. She needs that entire tax refund every year. Her household food for a household of two or three is about $360 a month. Entertainment expense is anywhere from $0 to $30 a month, $40 a month for clothing for a household of three for five years. That is a very tight budget for her to have to turn over $1,200 a month, a year, of that tax refund is very difficult for her. I'm not sure how she's done it so far. So the plain language of the model plan lies in the face of 1325B, because the model plan says that it designates as additional disposable income any monies received over or above $2,000. Well, the bankruptcy code says you can't do that. Bankruptcy code defines disposable income, and you have to do a fact-based analysis to see if the debtor needs the money, and the bankruptcy court did not do that here. Even though we could show that the debtor needed to keep the entire refund, the debtor is still required to turn over that extra $1,200 or so. So the bank, the model plan in effect establishes a per se rule that requires, that automatically designates $2,000 from every refund over and above, anything over and above $2,000 must be paid in in every case. Why not just establish a rule, local rule that says you have to turn over any extra income you get every year? Well, the Supreme Court said you can't do that, and that's because in Hamilton v. Lanning, they said the bankruptcy section 1325B says you have to turn over your projected disposable income, not your actual disposable income. So you cannot have a situation where you say you have to turn over anything extra. It's got to be the, so because the bankruptcy court exceeded its authority under Law v. Segal 9029, the standing order should be effectively struck, or at least struck from the debtor's plan. In addition, the plan has other problems with it. The section 4.1 says that the debtor has to, that the plan is automatically modified once the debtor receives that excess tax refund, that, and she has to turn it over, it's automatically modified at that time. Well, the bankruptcy court, the bankruptcy code does not provide for automatic modification. To modify a plan under 1329, Rule 3015.8 says you have to make a request. The request has to be by a motion. You have to get 21 days notice and the opportunity to object. Here, the, it's automatically modified. She files a notice, and we don't get the opportunity to object. If we disagree with it, if we said, look, she needs the income, that's the biggest problem. We don't have the opportunity later on in the case to say, you know what, we understand the language, but she needs it. She's got to pay for extraordinary stuff that may come up, and she may have a repair. If we can show she needs it, the court will say, nope, because it's in the model plan, you can't change that. It's not needed. So I would ask that the find that the, conclude that the bankruptcy court did not apply the correct law and find that it committed clear error when it confirmed the debtor's first and second amended, when it denied to confirm the first and second amended plan, and reverse and render an order striking section 4.1 from the plan. Now, the trustees still need to ask, answer a question that she hasn't answered in, throughout the entire case, and that question is, if a debtor needs that tax refund to pay for reasonable necessary living expenses, should she, is it still considered disposable income? Thank you. All right. Thank you, Ms. Moise. Ms. Guerrero, we'll hear from you, please. Yes, your honor. Vanessa Guerrero on behalf of the Chapter 13 trustee, the appellee in this case, and may it please the court, to address some issues that were mentioned by opposing counsel in this case, I'd like to inform the court that the basis of this, the confirmation of the plan and the plan itself in section 4.1 relied heavily on the 2017 tax return for the debtor in this case, in which the refund was $3,261. The amount of earned income credit towards that refund was $1,573. The remainder of it was the over withholdings of $1,847. So, in this case, when the debtor filed her Schedule I, she did so with payroll deductions for amounts withheld. The debtor did not revise this deduction on Schedule I and any of the amendments filed thereafter to reflect actual tax liability. Now, as the majority of courts have held, including the bankruptcy decisions in which the debtor heavily relies, such as In re Blake and In re Morales, if a debtor over withholds, the tax refunds are required to be turned over. It is only if the debtor accounts for tax expenses correctly on Schedule I that refunds need not be paid as additional plan payments. Now, some courts require calculation of a debtor's deduction for taxes on Schedule I by reference to actual tax liability. Other courts do not. Other courts, such as the Western District of Texas, do not require a change in the withholding, but rather account for the refund by turnover as the projected disposable income. Now, there is no prohibition of a debtor in adjusting his or her withholdings. It just merely requires the full disclosure on Schedule I. Now, the term projected requires a mathematic acumen, and this acumen is adjusted by deliberation and discretion. Section 4.1 is a great example of this. It eliminates the what-ifs. What if a refund is not received, or what if a refund is received and spent as opposed to prorated or deferred for expenses needed throughout the year? At the end of the day, the bankruptcy court could not confirm a plan that did not commit all projected disposable income. Now, the requirement to account for actual tax expense is much like the requirement for an above median debtor, and I would refer this court to Line 16 of the Official Form 122C2, which is Part 2 of the Means Test. This form instructs debtors to deduct actual tax liability. A debtor is to pay for the taxes. Now, in this case, the debtor, months after filing her original budget and five days prior to hearing, prorated refunds in varying amounts over several amended schedules. The debtor then first added expenses not originally budgeted on Schedule J and also increased those that were, and as she decreased the prorated amounts, debtor correspondingly and for the same ones that she increased. Expenses that in nature are somewhat fixed, such as electricity, water, sewage, trash, food, and housekeeping supplies for the same number of household members. This is recognized by bankruptcy practitioners, excuse me, as backing into the numbers, as is evident with the debtor essentially maintaining the same plan payment, each time failing to provide an explanation or support for the overall new and increased expenses. Debtor failed in accordance to those decisions in which she realized to show a specific and actual need for a retention of a refund. The debtor in her brief, throughout her brief, draws her own conclusions that the expenses were reasonable and necessary, yet the bankruptcy below made no such findings. Now, what I'd like to do, and before I continue... So, is that the answer to my question? Why, if they prorated on the schedules like this debtor tried to do, the reason that debtor is better off than with the Western District plan is because they're also going to correspondingly increase their expenses? Is that what you were just saying? Is that why they end up not, they don't pay all of it in reality? That is correct. I mean, the timing of the amendments in relation to the corresponding increases and decreases, as it relates to the amounts prorated on Schedule I, it can be inferred that the only reason that's being done is to retain the refund, wherein the code specifically requires a debtor to commit it. The means test for an above-median debtor requires the actual tax liability to be accounted for. Otherwise, you're turning in over the refunds. The majority of the decisions of bankruptcy courts require the turnover of the refund. Section 4.1 is the mechanism in this case, much like the means test, because it doesn't permit overestimation of a tax liability, and then the debtor to later reap the benefits of an inflated refund. The turnover of the refund corrects the error of the over-withholding. Thus, Section 4.1 is no different from the means test. And, you know, in this case, the District, that is the four sitting judges that adopted this plan, provided this mechanism with flexibility, and with flexibility for the debtor's expenses, and, of course, for those unanticipated expenses, and supports the heart of the VAP-CEPA reforms, which is to maximize payments to creditors. Now, I would like for this Court to keep in mind the number of scheduled confirmation hearings before the bankruptcy courts in the San Antonio Division of the Western District for the past two years. In 2018, the number of scheduled confirmation hearings was 2,861. In 2019, it was 2,824. And also, please keep in mind that San Antonio is just one of five divisions in the District. Now, it was originally enacted by the Bankruptcy Reform Act of 1978. Chapter 13 gave debtors flexibility in proposing a plan. However, over time, bankruptcy courts are the ones that develop plans for ease of administration and efficiency. These forms were developed by the Bankruptcy Reform Act of 1978. So, can you address the double-counting argument the other side was making? Is the trustee saying, you have to account for this on your schedule, so it counts $3,200 prorated each month, is counted as income as part of the plan, and then when she actually gets that $3,200 check, we're going to apply the Western District policy to it? Well, in this case, if the debtor actually deducted on Schedule I her actual tax liability, which is at her disposal, there would be no refund in the form of overwithholdings to amortize over Schedule I. And according to Section 4.1 of the plan, because the only other portion of the refund that remained would be earned income credit, was less than $2,000. So, the only person who's double-counting anything would be the debtor by overestimating the tax liability, along with amortizing then the refund. The form plans that were developed over time by bankruptcy courts were implemented through local rules, general orders, or standing orders, and were based on custom and practice within that particular court. Now, the result was that these form plans varied widely amongst the districts themselves. This, in turn, prompted the Bankruptcy Rules Committee to promote use of a national plan. And it is noted within the Advisory Committee notes to the bankruptcy rules that, number one, different plans in different districts made it difficult for creditors to know where to look to determine treatment. That an order-confirming plan, even if some of the provisions were not consistent with the code or the rules, were binding, requiring close scrutiny, and the bankruptcy judges must ensure that provisions comply with the code, even in the absence of the objection. So, the idea of the uniform plan structure would assist creditors, bankruptcy judges, and trustees in carrying out their responsibilities to review and understand and administer the plans. Now, faced with the opposition by bankruptcy judges to the mandatory use of a single national plan, the Rules Committee proposed Rule 3015C. While it is undisputed that the code permits a debtor to file a plan, Rule 3015C required bankruptcy courts to either adopt the national plan or its own form plan for use within a single district. The plan, whether it be national or the district plan, is just one of many mandated forms required to be used by a debtor in bankruptcy. Now, if the district chose to adopt its own plan, it must comply with Rule 3015.1. Most judicial districts, and at least according to the decision in Inouye-Parkman at that time, approximately 90% of the districts adopted their own form plan, complying with 3015.1, but so that it could reflect its own existing customs and practices. Of important note here is part one of the national plan provides in bold face type, and I quote, this form sets out options that may be appropriate in some cases, but the presence of the option on that form does not indicate that the option is appropriate in your circumstances or that it is permissible in your judicial districts. Plans that do not comply with local rules and judicial rulings may not be confirmable. The national plan provides... Let me ask you this. Yes, sir. I mean, at least from where I'm sitting, I mean, I understand all the policy arguments, but as I understand this, the debtor's principle argument is that this section is invalid, that it's contrary to, you know, the code, etc. All right, this one size fits all does not allow for case-by-case determination, depending on whether debtor is going to use, needs to use the money, etc. It just doesn't fit. Maybe good policy doesn't fit. That's my shorthand for it. In this case, we have an amicus brief filed by the National Consumer Bankruptcy Rights Center, and I'm just saying it's just there. I read it. Their position is 4.1 conflicts as well. I just would like to hear your response to the argument made in the amicus, which is similar to the debtors, but specifically that argument is targeted at the 4.1 conflicting with the tenor of the code, and that is that the debtor is treated individually on a case-by-case basis based on utility of the disposable income as opposed to sort of a slide rule kind of application that disallows that kind of case-by-case. Do you understand my question? I think I do, Your Honor. The amici argues the foreign plan of the Western District regarding retention of the refund up to $2,000 and the turnover the remainder has a negative impact on lower income debtors, such a debtor in this case, because they are more likely to receive a refund solely as a result of tax credits. Amici also seems to insinuate that the earned income credit and the additional child tax credits are excluded sources of income. I do direct this court to Section 10110A of the Bankruptcy Code. Tax refunds, regardless of its source, is not an excluded source of income, such as Social Security, and within the past year, as determined by Congress, certain VA disability benefits. This case establishes the issue in which amici's argument fails, and that is, and it cannot be ignored, is that the debtor here did not properly calculate her tax liability on Schedule I, which is even as amici notes in its own brief that that is a requirement first and foremost. Again, debtor Schedule I in this case included payroll deductions for amounts propelled as opposed to the actual tax liability. We were also dealing with, although a low-income debtor, a debtor whose refund isn't attributable to just earned income credit or additional child tax credits. It was attributable to overwithholdings, the majority of it being overwithholdings. Are you saying for a debtor whose refund is entirely credits, not miscalculation of withholdings, that the Western District Plan would be unlawful? No, Your Honor. Okay, so then what's the point of that distinction, I guess? Because I'm addressing the argument that amici had suggested within its brief. They wanted to parcel out low-income debtors and that low-income debtors by virtue of Section 4.1, and this debtor in this case would be required to turn over the refund. In this case, the debtor, Section 4.1 benefited the debtor because the debtor retained her earned income credit and retained by virtue of the retention up to $2,000, $427 of overwithholdings, that by which the majority of bankruptcy decisions determining that refunds are should have been turned over to the creditors. Does that answer your question, Your Honor? Well, I guess, I mean, but you're saying, oh, you're saying it would be unlawful even with, it would be okay even for someone who purely had the earned income tax credit as a refund. Yes, because earned income credit and additional child tax credit as a majority of the bankruptcy decisions indicate that those are sources of income and are sources of income that are required to be turned over as projected disposable income. But I don't think, I mean, is anyone saying, well, I didn't think the dispute here is whether it's income. I thought the dispute is, should we have, as Judge Stewart said, a one-size-fits-all, which is, this is how we're going to deal with it every time, which is what the Western District does, or should it be prorated on these schedules and looked at on an individual basis? Is anyone saying that this money should just be excluded from the bankruptcy system? Other than debtor's counsel saying that it should be excluded by virtue of the amortization on Schedule I. But that goes against the grain of what BAP SIPA was all about. The district court here, and the issue lies with Section 4.1 and the requirement to turn over the projected disposable income on an annual basis. The discretion afforded to bankruptcy courts with respect to determining projected disposable income was done in such a case, was done in this case, and in others within the district, out of efficiency and judicial economy. Section 4.1 allows the debtors in the court to comply with existing case law that holds that refunds are disposable income, as well as easing the costs that would arise from the objections to confirmations and evidentiary hearings. I mean, just imagine over 2,800 evidentiary hearings on the issue of tax refunds alone. The filing of a plan as stated by the bankruptcy court in any form the debtor wanted, such as here, striking Section 4.1 altogether, would create the administrative nightmare for courts and litigants in reviewing every provision of the plan that's filed. I know the Southern District of Texas Bankruptcy Court, that's a big district also, doesn't have this type of plan, so how do they deal with it? The Southern District also has a situation in which they're creating a savings plan for the debtors by requiring the debtors to turn over certain dollar amounts to the Chapter 13 trustee. Section 4.1 in reality is no different than that, because by allowing a debtor to retain up to $2,000, the district is allowing the debtor to retain as low as $6,000 up to $10,000 as a savings plan, essentially, and that is to the detriment to some degree to unsecured creditors, because if the refund is considered projected disposable income in its entirety and would have been required to be paid over, the unsecured creditor's dividend would have been vastly increased. In fact, it would have increased to approximately 76% or about $17,766, as opposed to the mere 12% or $2,700 that the debtor originally proposed. It's a distinction, but without a real big difference. The debtor at the end of the day is the one who's actually capturing more money on an annual basis than the creditors in this case, given the flexibility and the discretion that was afforded to the bankruptcy court by virtue of 3015.1 to adopt its own plan and to base it on existing customs and practices, and a practice that, of course, was one holding that refunds were disposable income. I mean, debtor here gets to retain 10,000 over the term of her plan, and again, she is returning all of her earned income credit, but also some overwithholdings that would ordinarily be required to be turned over. This overwithholding is an additional $2,000 over the life of the plan that should, at least according to the majority, be turned over to refunds to the trustee as projected disposable income. Case law supports the retention of some monies from a refund by a debtor for on-scene expenses, and case law supports a bankruptcy court's discretion in determining projected disposable income that a Chapter 13 debtor is required to commit to a plan, much like the discretion afforded to bankruptcy courts in for purposes of determining an amount that a debtor can retain and how much an amount can be paid to creditors is no different from the no-look compensation that even this court has indicated would be appropriate because both Section 330 of the Code and Rule 2016 require the filing of a formal fee application detailing services rendered, time spent, and for counsel to use the Lodestar method. However, this court, in order to streamline a bankruptcy court's review of Chapter 13 attorney's fees, addressing the need for both efficiency and flexibility in handling the typically large number of cases reviewed each year by the bankruptcy court, no-look fee arrangement to fast-track the process and to permit quick identification and ease the administrative burdens is permissible. All right. I have one second left here. You had one second. I had one second. Unless this court needs anything further from me. All right. My time is up. Okay. All right. Well, thank you. We appreciate your responsiveness to the court's questions and your argument. All right. We shift back to rebuttal. Mr. Millais. Thank you, Judge. And if you'll note, or I hope the court will notice that the trustee did not answer the question that I asked, and that is, if the tax refund is needed to pay reasonable necessary living expenses, is it still considered disposable income? And she didn't answer Judge Stewart's question directly either regarding the textual analysis and analyzing 1325B's effect on Section 4.1. She also said that the majority of courts hold that tax refunds must be turned over to disposable income. That is not so. The majority of the courts hold that tax refunds are income, and I'm not making a distinction today about whether the tax refund income is earned or not. To me, it is income, and it has to be treated as income under the disposable income test, and the debtor knew that going in. So we told her, all right, you have to treat it as income, and the way you do that is you list it on Schedule I. You report it just the same way you do with your employment. She included her wages of 16.55, 16.88, I think, on Schedule I, along with her child support to the plan. She devoted her wages to the plan. She's also devoting and committing her tax refund to the plan of $272 a month, the full amount. So to say that she's not committing it to the plan or that she's wanting to retain part of it, not pay it, is not so, because she's devoting it. Can you explain to me, why does getting a refund or, you know, winning the lottery or anything else, why does that change what your necessary expenses are? I mean, electricity, you know, you have your electricity expense, you've got your food expense, you've got your rent expense, you've got your clothing, and we can tick off the other categories. But, I mean, those to me are what they are, and if you end up getting some financial windfall, why does that change your – you're saying, you know, you're saying the trustee's not accounting for the fact that maybe this refund is going to add to the necessary expenses. Explain that to me. Well, two things. Most expenses are what they are. The electric bill generally is what it is, right? But how much you spend each month on clothing is going to differ based on how much money you have to spend on. A household of three in San Antonio, the bankruptcy court, the IRS allowance is about $180 a month for a household of three, $180 a month. The debtor is sacrificing because all she can afford to spend is $40, and all she can afford to spend on entertainment is $36. It also allows a miscellaneous column, so she's not taking advantage of the other allowance. I see. Because she doesn't have enough income, she's not maximizing what are otherwise allowable expenses. That's exactly correct. Someone who's making $80,000 a year who's in bankruptcy is probably already maxed out their expenses, so this isn't really an issue. That is correct. In that case, if there's additional income, that's going to increase the plan payment. In her case, she's got plenty of room to absorb some modest increases in income. And her income, let's say she gets an annual bonus. Should an annual bonus be reported on Schedule I? Yes, it should. And then we've always done that. We have some cases from some employers in San Antonio where our clients get an annual bonus of about $10,000 a year. Well, we report that on Schedule I, so it's devoted to the plan. We have to prorate it because any income that comes in, you have to do that. Also, with her income that we've listed of $1,866, keep in mind that's a prorated amount. She gets paid every two weeks. The amount she gets every two weeks is only about $1,600. So what we did is we took the biweekly pay period, multiplied it by 26, divided it by 12. So we prorated her income, and that's going to show a little artificially increased income, but the trustee's not complaining about that. So she is devoting the entire amount to the plan. And the other issue is there's not an opportunity down the road. The $2,000 is supposed to be, by definition, supposed to be for extraordinary expenses that pop up. Well, there's not a room down the road. She has to have surgery or needs money. COVID, for example, came along. What if she lost a job? She'd still have to turn over that refund. So the Northern District of Texas does it the correct way, all right? They have a standing order that says you have to turn over the tax refunds presumed income. You have to report it to the trustee. The trustee then can then—I see my time is up. May I finish my sentence? Yeah, finish your sentence. The trustee has the opportunity to file a motion to modify and ask that that money be paid, and the trustee has the ability to object to that. Thank you for your time, judges. All right, thank you both for your argument. Both of you in San Antonio? Yes, your honor. All right, easy question. All right, thanks for the oral argument and the briefing on this interesting case, to put it mildly. The case will be submitted, and we will get an opinion out in due course, all right?